J-S50039-20

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | : | |
| v. | : | |
| QUDRE MCMILLAN, | : | No. 1199 EDA 2020 |
| Appellant | : | |

Appeal from PCRA Order Entered May 4, 2020
in the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0005532-2014

BEFORE:    BENDER, P.J.E., SHOGAN, J. and STRASSBURGER, J.*

MEMORANDUM BY BENDER, P.J.E.:                    **FILED JUNE 09, 2021**

Appellant, Qudre McMillan, appeals from the May 4, 2020 order dismissing his petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546.  We affirm.

Appellant and co-defendant, Kareem Evans, sexually assaulted a young woman in 2014.[1]  A prior panel of this Court provided the following factual history:

> The [v]ictim in this matter is a twenty-year-old resident of Philadelphia and mother of two children.  In August of 2014, the victim, a former home health aide, had begun to engage in prostitution, advertising her services as an "escort" on an [I]nternet website called "Backpage."

---

[1] Evans filed a PCRA petition, which the PCRA court also dismissed on May 4, 2020.  Evans appealed to this Court.  That appeal is currently pending at docket number 1155 EDA 2020.

*Retired Senior Judge assigned to the Superior Court.

On August 8, 2014, at approximately 3:00 a.m., the victim received a telephone call from a man identifying himself as "Kareem," later identified as twenty-one-year-old Kareem Evans. The victim agreed to meet Evans … in Bristol Borough, Bucks County. Lorenzo Broggi drove the victim to the prearranged location where she met Evans. Evans then led her on foot to another location, an unoccupied residence located on Cedar Street in Bristol Borough. After entering an unfurnished backroom of that building, the victim plugged the charger for her cellphone into a wall outlet.

The victim, already concerned about the change of location, became frightened when she heard someone jiggling the handle of the front door. When Evans left the backroom and headed for the front door, the victim immediately used her cell phone to call Mr. Broggi, her driver. When Evans returned, he attempted to take the phone from the victim but she was able to temporarily regain control of it. The victim then attempted to leave the building. When she began to do so, she was unexpectedly confronted by a second man, later identified as [Appellant. Appellant] was armed with a shotgun. He pointed it at her and told her not to move. Raising both hands, the victim told [Appellant] that he could take the ten dollars in her pocket and her phone. [Appellant] continued to approach the victim, forcing her to retreat into the backroom.

Once the victim was again in the backroom, Evans physically restrained her from behind and placed his hand over her mouth and nose to prevent her from breathing. Fearful for her life, she begged him not to kill her, repeatedly telling him, "I have kids." As she struggled with Evans, she heard a car horn sounding. Evans told her "not to f—ing scream" and he would let her live. She complied, and he released her. The victim sat in the corner crying as [Appellant] and Evans attempted to access the phone to see if she had called anyone. When asked if she had made a call, she told them she had not.

Evans then "dismissed" [Appellant] from the room and proceeded to orally and vaginally rape the victim, threatening to "punch her in her f—ing head" and kill her if she did not do what she was told. Evans ejaculated inside her. As Evans sexually assaulted the victim, [Appellant] occasionally watched from his position in the hallway. When Evans then left the room, [Appellant] entered. The victim continued to cry as [Appellant]

vaginally raped her. He ejaculated on her buttocks. [Appellant] then left the room. While the victim waited for her attackers to return, she heard a door shut. When neither attacker returned after two minutes, the victim fled the building.

Shortly after dropping the victim off at the Market Street address where Evans was waiting, Mr. Broggi received a call from the victim. When he answered, the victim did not speak to him. Mr. Broggi heard a scuffle in the background. As he listened, he heard a male voice. Mr. Broggi testified that he heard the victim crying and yelling. He specifically heard her say that she did not have any money with her. He also heard her tell someone to leave her alone, and not to hurt her. The phone call abruptly ended. Realizing that the victim was in trouble, Mr. Broggi returned to Market Street in an attempt to locate the victim. He circled the area sounding the horn of his vehicle. Mr. Broggi's efforts to locate the victim were unsuccessful.

At approximately 4:30 a.m., Arthur Carter and his son were driving on Market Street approaching Cedar Street when the victim ran out from Cedar Street and ran in front of his van. When Mr. Carter lowered his window to speak to her, she told him that she had been raped and that she needed help. Mr. Carter testified that the victim was hysterical, that she was crying, and that her hair looked "like somebody had been dragging her around." Her clothes were askew and her underwear was pulled out of her pants. Mr. Carter called 911 and remained with her until assistance arrived. The victim was then transported from the scene to Abington Memorial Hospital for a Sexual Assault Examination. During that examination, vaginal and rectal swabs were obtained.

A search warrant was obtained for the Cedar Street address. During the search, the cell phone charger to the victim's telephone was found on the floor of the back room of the residence. Police contacted the victim's cell phone carrier who informed them that the victim's cell phone was located at the intersection of Headley Street and Pine Street in Bristol Borough, with an uncertainty of thirty-five meters. Evans was staying at [a residence on Pine Street, which is] located at the intersection of Headley and Pine Streets. That residence is approximately six blocks away from Cedar Street where the assaults occurred.

On August 9, 2014, police observed [Appellant] in the area of Cedar Street.  On that same date, police executed a search warrant [for the Pine Street residence].  When police arrived, Evans was present.  While detectives were executing the search warrant, [Evan's mother had a telephone conversation on speaker with Evan's younger brother, Terrance Farley, and Appellant, who were together at the time.  Later, Appellant] arrived at the residence.  The victim's cell phone was found concealed beneath a seat cushion of a sofa inside the residence.  Kalesha Cruz, Evans's fiancée, told police and later testified that she observed [Appellant] give Evans the cell phone on Friday, August 8, 2014.

A photo array, which included an image of Evans as Photograph Number 2, was displayed to the victim. The victim almost immediately pointed to Photograph Number 2, gasped, said, "That's him. That's the man who raped me," and began to cry.

The vaginal and rectal swabs of the victim were submitted to the Pennsylvania State Police Bureau of Forensic Services for serological and DNA analysis. The items were determined to contain spermatozoa and the DNA of [Appellant] and Evans.

***Commonwealth v. McMillan***, No. 2490 EDA 2015, unpublished memorandum at 1-4 (Pa. Super. filed Nov. 23, 2016) (citing Trial Court Opinion, 11/13/15, at 2–5) (citations to the record omitted).

On March 9, 2015, Appellant's and Evans' cases proceeded to a joint jury trial.  At the conclusion of the trial, the jury convicted Appellant of rape by threat of forcible compulsion, robbery by threat of serious bodily injury, robbery by force, terroristic threats, theft by unlawful taking, criminal conspiracy to commit robbery by threat of serious bodily injury, and criminal conspiracy to commit theft.  The court deferred sentencing for Appellant to undergo an evaluation by the Sexual Offender Assessment Board (SOAB) pursuant to 42 Pa.C.S. § 9799.24.  Based upon the findings of the SOAB, and

with the agreement of the parties, the court found Appellant to be a Sexually Violent Predator. The court sentenced Appellant on July 13, 2015, to an aggregate term of 20 to 40 years' incarceration,[2] and required him to register with the Pennsylvania State Police for the remainder of his life pursuant to Pennsylvania's Sex Offender Registration and Notification Act, 42 Pa.C.S. §§ 9799.10 to 9799.75. *See* 42 Pa.C.S. § 9799.15(a)(6) ("A sexually violent predator shall register for the life of the individual."). Appellant did not file a post-sentence motion.

Appellant timely filed a notice of appeal, and this Court affirmed his judgment of sentence on November 23, 2016. *Commonwealth v. McMillan*, 159 A.3d 597 (Pa. Super. 2016) (unpublished memorandum). Appellant did not file a petition for allowance of appeal with our Supreme Court.

On November 17, 2017, Appellant timely filed a *pro se* PCRA petition. The PCRA court appointed Patrick J. McMenamin, Jr., Esquire, to represent Appellant.[3]

> On March 12, 2018, [Attorney] McMenamin filed a "no-merit" letter pursuant to *Commonwealth v. Finley*, 550 A.2d 213 (Pa. Super. 1988)[,] and moved to withdraw as PCRA counsel. By order dated April 18, 2018, the Commonwealth was granted an extension of time to file a response to PCRA counsel's "no[-]merit" letter and request to withdraw. On May 2, 2018, the Commonwealth filed its response.

---

[2] Specifically, the court sentenced Appellant to consecutive terms of 10 to 20 years' incarceration for his rape conviction, and two terms of 5 to 10 years' incarceration for his convictions of robbery by threat of serious bodily injury, and criminal conspiracy to commit robbery by threat of serious bodily injury.

[3] The PCRA court had initially appointed different counsel.

On June 7, 2018, [Appellant] requested a "delay" of the matter in order to obtain a copy of the transcripts to prepare a response to PCRA counsel's "no[-]merit" letter and request to withdraw. On July 12, 2018, private counsel, John J. Fioravanti, Jr., [Esquire,] entered his appearance and filed a motion requesting an additional [45] days to file an amended PCRA petition. By order dated July 18, 2018, [Attorney] Fioravanti's motion was granted. He was directed to file an amended petition on or before September 10, 2018. The Commonwealth was directed to file a response within [30] days of receipt of the amended petition.

On September 10, 2018, [Attorney] Fioravanti filed an Amended Post-Conviction Relief Act Petition[. In the petition, Attorney Fioravanti claimed trial counsel was ineffective for failing to: sever Appellant's case from Evans' case; seek suppression of Appellant's audio-recorded statement to detectives; ask a sufficient number of questions during *voir dire*; and object to the sentence or file a post-sentence motion to reconsider. ***See generally*** Amended PCRA Petition, 9/10/18.] The Commonwealth filed an Answer to the Amended Petition on October 9, 2018.

On December 19, 2018, [Attorney] Fioravanti filed a motion seeking leave to file a second amended PCRA petition. By order dated December 21, 2018, [Attorney] Fioravanti's motion was granted. The Commonwealth was directed to file a response within 30 days of receipt of the second amended petition.

On February 4, 2019, [Attorney] Fioravanti filed a Second Amended [PCRA] Petition. [In the petition, Attorney Fioravanti claimed trial counsel was ineffective for failing to object to testimony of Detective Landamia concerning cell phone usage and location. Second Amended Petition, 2/4/19, at 1-2]. On March 11, 2019, the Commonwealth filed an Answer to the Second Counseled PCRA Petition.

On June 5, 2019, a hearing was held to address [Appellant's] PCRA claims. [Appellant, Appellant's mother, and Appellant's trial counsel, Attorney Matthew Razzano, Esquire, testified at the hearing.] At the conclusion of the hearing, the parties were directed to file briefs. [Attorney] Fioravanti filed a Brief in Support of Post-Conviction Relief [and the Commonwealth filed a brief in opposition of Post-Conviction Relief] on October 8,

2019. … By order dated May 4, 2020, Appellant's request for PCRA relief was denied.

PCRA Court Opinion (PCO), 9/9/20, at 5-7.

This timely-filed notice of appeal followed. Appellant complied with the PCRA court's order to file a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b). The PCRA court filed its Rule 1925(a) opinion on September 9, 2020. On appeal, Appellant presents the following issues for our consideration:

> A. Was trial counsel ineffective in failing to move to suppress Appellant's statement?
>
> B. Was trial counsel ineffective in failing to file a post-sentence motion to reconsider the sentence and failing to object to the sentence?

Appellant's Brief at 4.

Initially, we note that:

> "In reviewing the propriety of an order granting or denying PCRA relief, an appellate court is limited to ascertaining whether the record supports the determination of the PCRA court and whether the ruling is free of legal error." *Commonwealth v. Johnson*, … 966 A.2d 523, 532 ([Pa.] 2009). We pay great deference to the findings of the PCRA court, "but its legal determinations are subject to our plenary review." *Id.*

*Commonwealth v. Matias*, 63 A.3d 807, 810 (Pa. Super. 2013).

In addressing the merits of Appellant's ineffectiveness claims, we are mindful that counsel is presumed to be effective, and the burden of demonstrating ineffectiveness rests on the petitioner. *Commonwealth v. Rivera*, 10 A.3d 1276, 1279 (Pa. Super. 2010).

> To satisfy this burden, an appellant must plead and prove by a preponderance of the evidence that [] (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and, (3) but for counsel's ineffectiveness there is a reasonable probability that the outcome of the challenged proceeding would have been different. Failure to satisfy any prong of the test will result in rejection of the appellant's ineffective assistance of counsel claim.

*Commonwealth v. Holt*, 175 A.3d 1014, 1018 (Pa. Super. 2017) (internal citations omitted).

In Appellant's first issue, he contends that his trial counsel was ineffective for failing to file a motion to suppress Appellant's statement to detectives, as he claims he was subjected to a custodial interrogation without receiving warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Appellant's Brief at 12.

Generally, "[t]he failure to file a suppression motion under some circumstances may be evidence of ineffective assistance of counsel." *Commonwealth v. Metzger*, 441 A.2d 1225, 1228 (Pa. 1981). "However, if the grounds underpinning that motion are without merit, counsel will not be deemed ineffective for failing to so move." *Id.* "[T]he defendant must establish that there was no reasonable basis for not pursuing the suppression claim and that if the evidence had been suppressed, there is a reasonable probability the verdict would have been more favorable." *Commonwealth v. Watley*, 153 A.3d 1034, 1044 (Pa. Super. 2016) (citation omitted).

"[A] person must be informed of his or her *Miranda* rights prior to custodial interrogation by police." *Commonwealth v. Bess*, 789 A.2d 757, 762 (Pa. Super. 2002). "Interrogation means police questioning or conduct calculated to, expected to, or likely to evoke an admission." *Id.* (internal quotation marks omitted). "Interrogation occurs when the police should know that their words or actions are reasonably likely to elicit an incriminating response, and the circumstances must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* Our Supreme Court has explained *Miranda* protections as follows:

> To protect an individual's Fifth Amendment privilege against self-incrimination, the United States Supreme Court has held that, before an individual in police custody may be interrogated, he must first be informed, in clear and unequivocal terms, that he has the right to remain silent, that anything he says can and will be used against him in court, and that he has the right to consult with counsel and to have counsel present during interrogation, and, if he is indigent, counsel will be appointed for him.

*Commonwealth v. Frein*, 206 A.3d 1049, 1064 (Pa. 2019) (footnote omitted) (citing *Miranda*, 384 U.S. at 467-69). A "statement made by a criminal defendant during a custodial interrogation who has not been apprised of the warnings required by *Miranda*, generally must be suppressed." *Commonwealth v. Bishop*, 217 A.3d 833, 835-36 (Pa. 2019).

By way of background, at trial, the Commonwealth presented the testimony of ten witnesses, including the victim. Detective Timothy Carroll testified that he was part of the team that executed the search warrant at the Pine Street residence. N.T., 3/11/15, at 15. Evans, Evans's mother, and Ms.

- 9 -

Cruz were present inside the residence when Detective Carroll and other officers arrived, and Evans was immediately placed under arrest. *Id.* at 15. During the execution of the warrant, but prior to Appellant's subsequent arrival, Evans's mother had a telephone conversation with Appellant. Detective Carroll instructed Appellant's mother to put the call on speaker, and Detective Carroll was then able to hear the conversation. *Id.* at 29. Detective Carroll relayed the substance of the conversation at trial, stating that Appellant "said that they had called a website and paid for pussy and that they had taken the woman's phone and money." *Id.* at 30.

Appellant arrived at the Pine Street residence 20 to 30 minutes later. *Id.* at 25. Detective Carroll interviewed Appellant and recorded their conversation. *Id.* at 24. The audio-recorded statement was played for the jury. N.T., 3/11/15, at 26, 28, Commonwealth's Exhibit 30. At the beginning of the recording, Detective Carroll stated that he read a preprinted card of *Miranda* rights to Appellant, explained that Appellant was not required to speak to him and was not under arrest, and asked Appellant if he would speak to the police without an attorney present to give Appellant's version of the events that occurred on Cedar Street. *Id.* Detective Carroll asked if that summary was accurate and Appellant responded, "Yes." *Id.* Detective Carroll then asked, "Do you want to talk to us about that?" and Appellant stated, "It don't matter." *Id.* Detective Carroll then asked, "Well, do you want to?" and Appellant responded, "Yes." *Id.*

Appellant then detailed his version of the events that occurred. Appellant claimed he was "chilling" with Evans and the pair ordered "coochie" from an Internet website. *Id.* Appellant refused to provide the name of the website. Appellant and Evans watched the victim being dropped off by a van. The three individuals then proceeded to enter a house. Appellant did not know who owned the house, but he knew he could get in the house because it was unlocked. Evans and the victim went to a back bedroom. Although he did not witness the act, based on the noises he heard coming from the room, Appellant claimed Evans had consensual sex with the victim. Evans then exited the room and said to Appellant that he would wait outside of the room for him. Appellant explained that he then entered the room and engaged in consensual sex with the victim, but denied ejaculating on the victim. After, he said the victim stated that her phone was missing and she would tell the police that she was raped. Appellant responded, "Whoa, I didn't rape you." *Id.* Appellant concluded that after that exchange, "[Evans and I] both just bounced and left. That was the end of it." *Id.* When questioned by Carroll, Appellant denied stealing the victim's phone.

On appeal, Appellant avers that his trial counsel acted ineffectively by failing to move to suppress this audio-recorded statement. Appellant's Brief at 12-15. Appellant stresses that in consideration of the circumstances surrounding his statement, such as the location where he provided the statement, the presence of experienced detectives, his young age, and his

lack of experience with the criminal justice system, his statement was obtained in violation of his *Miranda* rights. *Id.* at 15. Based on these circumstances, Appellant asserts that there is arguable merit to his claim that counsel should have challenged the statement in a motion to suppress. *Id.*

At the PCRA hearing, Appellant testified that prior to trial, he told trial counsel he provided the statement to Detective Carroll because he "was afraid and scared" and "thought [he]'d be locked up…." N.T., 6/5/19, at 11. However, Appellant admitted that he never told trial counsel that the detectives threatened him, promised him anything in exchange for the statement, or forced him to waive his *Miranda* rights. *Id.* at 18. Most significant, Appellant agreed that he went voluntarily to speak with detectives at the home of Evans's mother, and that he waived his *Miranda* rights prior to giving the statement to detectives. *Id.*

Trial counsel testified that Appellant stated to him that he voluntarily gave the statement to detectives, and Appellant never indicated that he was frightened or concerned that he would be arrested had he not spoken with the detectives. *Id.* at 36-37. At the PCRA hearing, the Commonwealth introduced the preprinted card of *Miranda* rights, as well as the waiver of rights form that was signed by Appellant. *Id.* at 63.

The PCRA court concluded that Appellant failed to meet his burden of establishing the ineffective assistance of trial counsel. First, the PCRA court found Appellant failed to prove his claim was of arguable merit. The PCRA

court credited the testimony of trial counsel and the portion of Appellant's testimony where he stated that he never indicated to trial counsel that detectives caused him to involuntarily waive his ***Miranda*** rights. PCO at 10-11. The PCRA court found the testimony of trial counsel and Appellant, and Appellant's written waiver of his ***Miranda*** rights, provided no basis to support a motion to suppress.

Upon review, we conclude that the PCRA court's decision is supported by the record. Appellant's claim that his counsel should have sought suppression of his statement because of a violation of ***Miranda*** is meritless. Appellant indicated that he waived his ***Miranda*** rights in the audio-recorded statement presented at trial. At the PCRA hearing, Appellant testified that he waived his ***Miranda*** rights, and a waiver of ***Miranda*** rights form signed by Appellant was admitted. ***See*** N.T., 3/11/15, at 26, 28; N.T., 6/5/19, at 18, 63, Commonwealth's Exhibit 30; ***see also Commonwealth v. Freeland***, 106 A.3d 768, 778 (Pa. Super. 2003) ("It is axiomatic that trial counsel will not be considered ineffective for failing to pursue meritless claims."). "Failure to prove any prong of th[e ineffectiveness] test will defeat an ineffectiveness claim." ***Commonwealth v. Fears***, 86 A.3d 795, 804 (Pa. 2014) (citation omitted). Thus, the PCRA court did not err in dismissing this claim.

Next, Appellant contends that trial counsel provided ineffective assistance by failing to file a motion for reconsideration of Appellant's sentence, despite him and his mother ostensibly having asked trial counsel to

do so. Appellant's Brief at 21. At the PCRA hearing, Appellant testified that immediately after he was sentenced, he asked trial counsel to "file for a resentence," but trial counsel responded that "we shouldn't because it most likely would be denied and we should start right away with the appeal." N.T., 6/5/19, at 14. Similarly, Appellant's mother testified that on the same day Appellant was sentenced, she asked trial counsel what the next steps were and if trial counsel "could file for reconsideration." *Id.* at 29. According to Appellant's mother, trial counsel provided the same response to her question as he did to Appellant's question. *Id.* at 30.

At the PCRA hearing, trial counsel testified that after he and Appellant spoke, Appellant decided not to file a motion for reconsideration. *Id.* at 56, 65-67. Trial counsel wrote an email to Appellant's current counsel, wherein he indicated the following:

> Please accept this email as my response to your questions. After the sentence[,] I spoke with [Appellant] about a motion for reconsideration of sentence and an appeal. [Appellant] did not want to bother with the motion for reconsideration and just wanted to appeal the case. I explained that if we do not file the motion for reconsideration within the ten (10) days[,] that he would forever lose the right to do so. He still instructed me to only file the appeal. I do not recall any conversations with his mother regarding the issue. But, even if she did call me, she was not my client and the decision was [Appellant's].

*Id.* at 56, Exhibit D-1 (unnecessary capitalization omitted).

The PCRA court credited trial counsel's version of events. PCO at 20. "The law is clear that we are bound by the credibility determinations of the PCRA court, where such findings have support in the record."

- 14 -

J-S50039-20

***Commonwealth v. Clark***, 961 A.2d 80, 87 (Pa. 2008).  Upon review, the record supports the court's conclusion that Appellant did not ask trial counsel to file a motion for reconsideration of sentence on his behalf and, therefore, there is no arguable merit to this aspect of his ineffective-assistance-of-counsel claim.  Accordingly, the PCRA court did not err in dismissing this claim.

Based on the foregoing, we affirm the order of the PCRA court.

Order affirmed.

Judge Strassburger did not participate in the consideration or decision of this case.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 6/9/2021*

- 15 -